[No. B164482. Second Dist., Div. Five. Jan. 21, 2004.]

JOHN CORBY, Plaintiff and Respondent, v.
GULF INSURANCE COMPANY, Defendant and Appellant.

**COUNSEL**

James S. Link and Larry A. Rothstein for Defendant and Appellant.

Law Offices of Jerry K. Staub, Jerry K. Staub and Patricia Venegas for Plaintiff and Respondent.

**OPINION**

**ARMSTRONG, J.—**

Summary

This case concerns a surety bond issued by appellant Gulf Insurance Company pursuant to Business and Professions Code sections 11013.2[1] and 11013.4,[2] part of the California Subdivided Lands Law. Those statutes provide that it is unlawful for a developer to sell lots or parcels within a subdivision unless the money paid or advanced by purchasers is safeguarded pending transfer of title. The statutes give the developer several options for accomplishing this, one of which is to furnish a bond "to the State of California . . . for the benefit and protection of purchasers or lessees of such lots or parcels, in such amount and subject to such terms as may be approved by the commissioner, which shall provide for the return of moneys paid or advanced by any purchaser . . . ." (§ 11013.2, subd. (c); § 11013.4, subd. (b).)

The plaintiff in this case, John Corby, sought to buy a house in a project subject to the Subdivided Lands Law. Gulf issued a bond to the developer. The bond, issued on a Department of Real Estate form under sections 11013.2 and 11013.4, provides that it is "for the benefit and protection of each and every purchaser of any lot or lots within each and every subdivision now or hereafter offered for sale or lease, or sold or leased . . . ." When

---

[1] All further statutory references are to that code.

[2] Section 11013.2 is applicable to subdivisions which are subject to blanket encumbrances, and section 11013.4 is applicable to subdivisions which are not subject to such encumbrances. The language quoted in the text herein is the same in both statutes, but they are not identical in all respects. The record does not tell us whether LaVina Estates was subject to a blanket encumbrance, and the bond references both statutes.

Corby sought recourse to the bond, Gulf denied coverage on the ground that he had deposited his money with the developer prior to the date the bond was issued.[3] We conclude, as did the trial court, that Corby was entitled to recover under the bond.

## Facts

This case was tried on undisputed facts: on February 4, 2001, Corby signed a purchase agreement with La Vina Estates, LLC, agreeing to purchase a house in a planned community then being developed. He deposited $10,000 into escrow. The house was not yet complete, and the closing date estimated in the contract was June 15, 2001. Between February 9 and April 15, Corby paid La Vina Estates and its related entities almost $109,000 for options and upgrades.

On May 25, 2001, Gulf Insurance Company issued a rider to a blanket surety bond previously issued to Compass Homes, a principal in La Vina. The rider added La Vina Estates and 10 other limited liability corporations as principals to the bond.

The bond itself followed the language prescribed by the California Department of Real Estate for such bonds and read, in pertinent part, "Whereas, Principal has elected, in lieu of individual tract bonds, to give this surety bond to the State of California in compliance with Section 11013.2(c) and/or Section 11013.4(b) of the Business and Professions Code of the State of California, as applicable, as a blanket and continuing obligation for the benefit and protection of each and every purchaser of any lot or lots within each and every subdivision now or hereafter offered for sale or lease, or sold or leased by Principal directly or through his agents in the State of California."

The closing date on Corby's purchase was extended several times, the last extension being to December 15, 2001. However, no progress had been made on the house for some time, and Corby lawfully cancelled his escrow on January 7, 2002. The escrow company returned $9,900 to Corby, but he did not receive any part of the $109,000. He made a claim on Gulf for that sum. Gulf denied the claim on the ground that Corby had entered into the purchase contract and purchased the upgrades before the bond was issued.

---

[3] The parties apparently agree that, but for the issue before us here, Corby would be entitled to recover on the bond.

Corby sued Gulf and others.[4] As to Gulf, the case was tried to the court, which found that the bond covered Corby's claim, ruling that the "now and hereafter" language of the bond applied to lots "offered for sale or lease," but that "sold or leased" was an independent clause, not subject to that limit.

Applicable Law

■ The question before us on appeal concerns interpretation of a written instrument, the bond, and our review is thus de novo. (*Cooper Companies v. Transcontinental Ins. Co.* (1995) 31 Cal.App.4th 1094, 1100 [37 Cal.Rptr.2d 508].)

■ In general, a surety bond is interpreted by the same rules as other contracts. (*Bank of America v. Dowdy* (1960) 186 Cal.App.2d 690, 693 [9 Cal.Rptr. 779].) That is, we seek to discover the intent of the parties, primarily by examining the words the parties have chosen (*Airlines Reporting Corp. v. United States Fidelity & Guaranty Co.* (1995) 31 Cal.App.4th 1458, 1461 [37 Cal.Rptr.2d 563]) giving effect to the ordinary meaning of those words. (*Stamm Theatres, Inc. v. Hartford Casualty Ins. Co.* (2001) 93 Cal.App.4th 531, 538 [113 Cal.Rptr.2d 300].) Finally, " 'Where a surety bond is given pursuant to the requirements of a particular statute, the statutory provisions are incorporated into the bond.' [Citation.]" (*Bank of America v. Dowdy, supra,* 186 Cal.App.2d at p. 693.)

Gulf points out the words of this bond were not chosen by the parties, but that the bond was issued on a California Department of Real Estate form, then argues that the rules of statutory interpretation, not contract interpretation, apply, so that we should give effect to the intent of the Legislature, not the parties. Gulf argues that the Legislature intended a narrow reading of the bond, reaching this conclusion by combining the rule that in making legislation, the Legislature is presumed to have knowledge of existing law, with the long-standing principle that a surety on an official bond undertakes no liability for anything which is not within the letter of his contract. (*Goggin v. Reliance Ins. Co.* (1962) 200 Cal.App.2d 361, 365 [19 Cal.Rptr. 446].)

■ We find the suggestion that the rules of statutory interpretation apply is a reasonable one. The bond was not drafted or negotiated by the parties, and we thus cannot look to their intent. Of course, on a question of statutory interpretation, we also look to the ordinary meaning of the words. (*United Medical Management, Ltd. v. Gatto* (1996) 49 Cal.App.4th 1732, 1739 [57 Cal.Rptr.2d 600].)

---

[4] Default judgment was entered against LaVina Estates and its related entity, Compass Homes.

We do not, however, agree with Gulf's implicit argument that recourse to the Legislative intent would lead us to a different interpretation of the bond. We presume that the Legislature was aware not just of the rule Gulf cites, but of the long-standing rule that when a surety bond is given pursuant to a statute, the statutory provisions are incorporated into the bond. (*Bank of America v. Dowdy, supra,* 186 Cal.App.2d at p. 693.) As we explain later, the statutes contain a clear expression of a Legislative intent to protect *all* buyers, an intent which is entirely consistent with the language of the bond.

Gulf argues, though, that in this case the language of the statute should not be read into the bond. Here, Gulf points to the statutory provision that any bond be "subject to such terms as may be approved by the commissioner" and argues that this means that the bond itself is law, or at least a quasi-legislative rule with the dignity of a statute, and thus must be read narrowly, without the statutes.

In support, Gulf cites *Yamaha Corp. of America v. State Bd. of Equalization* (1998) 19 Cal.4th 1 [78 Cal.Rptr.2d 1, 960 P.2d 1031], in which the Supreme Court considered the standard courts should apply when reviewing the regulations, rules, or opinions promulgated by administrative agencies. The Court drew a distinction between quasi-legislative rules made by an agency that has been granted substantive rulemaking powers by the Legislature and administrative rules, which merely interpret statutes. The first kind of rule is afforded far more deference (*id.* at pp. 10–11), deference that Gulf argues we should apply here.

██ Gulf's argument is meaningful only if the bond differs from the statute, and limits coverage to purchases initiated after the bond is issued— and that is not how we read the bond. We note, too, that quasi-legislative regulations are those adopted by an agency to which the Legislature has confided the power to make law (*Yamaha Corp. of America, supra,* 19 Cal.4th at p. 10; *Ramirez v. Yosemite Water Co.* (1999) 20 Cal.4th 785, 799 [85 Cal.Rptr.2d 844, 978 P.2d 2]), and that we do not see that in providing that the terms and amount of the bond must be acceptable to the Real Estate Commissioner, the Legislature delegated that power. Nor do we see that *Yamaha* contravenes the long-standing rule about bonds issued pursuant to statute.

## Discussion

Applying the rules recited above, we find that the trial court took too technical a view of the language of the bond. It does not create two categories of buyers, those who made their deposits before the date the bond was issued, and those who make their deposits "now or hereafter." The bond refers to lots sold and to lots offered for sale so that all purchases will be included, not so

that some purchases may be excluded. Nor do we agree with Gulf that the term "now or hereafter" applies to both lots offered for sale and lots sold, so that if the offer or purchase is prior to the date of the bond, the purchaser is unprotected.

Both readings ignore the fact that the bond is given "to the State of California" for "the benefit and protection of *each and every* purchaser." On a plain reading, the bond does not draw a distinction between lots offered for sale and lots sold. Instead, it applies to all purchases of lots in any subdivision now or hereafter offered for sale. "Now or hereafter" refers to the subdivision, not to the individual lot or buyer.

Moreover, "now" means "at the present time." Even if the phrase "now or hereafter" referred to lots (not the subdivision) we would find that Corby's lot was "sold" at the time the bond was issued.[5]

Miller and Starr is in accord, describing the bond as one which "must indemnify the return of all funds advanced by each purchaser or lessee on account of the purchase or lease of subdivision interests, in the event the subdivider does not deliver the title or interest contracted for within the time provided in the purchase contract or lease for any reason other than the uncured default of the purchaser or lessee." (9 Miller & Starr, Cal. Real Estate (3rd ed. 2001) § 25.34, p. 79.)

We note in this regard that the rider which added La Vina as a principal to the bond also added 10 other subdivisions. There is no indication in the record that when Gulf issued the bond it knew which lots in those subdivisions had been spoken for and which had no current buyers, or that its underwriting was based on the distinction it now seeks to make.

Further, when we read the language of the statute into the bond, we again find that the bond protects all buyers, no matter when the deposit is made. Under sections 11013.2 and 11013.4, a developer must safeguard buyers' deposits until title is transferred—otherwise, sale or lease of any parcel is unlawful. The developer may choose one of the listed alternatives or use another method which the Commissioner determines will carry out the intent of the Subdivided Lands Law. (§ 11013.2, subd. (d); § 11013.4, subd. (f).) That intent is clear. "The purpose of the Subdivided Lands Law is to protect

---

[5] There is a dispute about the meaning of the word "sold." The trial court found that it meant the close of escrow and includes Corby. Gulf argues that it means execution of the purchase agreement, so that Corby is excluded. We need not resolve this dispute. Corby's lot was either sold at the time the bond was issued—in which case his claim is covered—or it was still being offered for sale, in which case his claim was covered. The inclusive language of the bond does not allow for a third, in-limbo, option.

purchasers of units in new subdivisions from fraud and misrepresentation in the public sale, lease, or financing of subdivided lots or interests." (9 Miller & Starr, Cal. Real Estate, *supra*, § 25.31, p. 10.) And, the purpose of sections 11013.2 and 11013.4 is to "protect the public from loss that may result if the subdivider is unable to deliver the subdivision interest in the condition as represented for the cost agreed to be paid by the purchaser." (9 Miller & Starr, Cal. Real Estate, *supra*, § 25.33, p. 77.)

█ The statutes provide that the bond must be "for the benefit and protection of each and every purchaser." Nothing in the statutes would allow a developer to fail to protect any purchaser's deposit, based on the date of purchase.

Finally, Gulf suggests that application of the bond to this claim would improperly apply the bond retroactively, seeking to distinguish this case from *People v. Great American Ins. Co.* (1963) 222 Cal.App.2d 552 [35 Cal.Rptr. 267], cited by the trial court, which held that in some circumstances a bond may be interpreted retroactively. We need not detain ourselves with this argument. We do not interpret the bond retroactively, but in accord with its own terms.

Disposition

The judgment is affirmed.

Grignon, Acting P. J., and Mosk, J., concurred.

Appellant's petition for review by the Supreme Court was denied April 14, 2004.